IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMARA WALKER,<br>    *Plaintiff,*<br><br>    v.<br><br>HEALTH PARTNERS PLAN, INC.,<br>    *Defendant.* | :<br>:<br>:<br>:  CIVIL NO.  23-1089<br>:<br>:<br>: |

MEMORANDUM

**Scott, J.**                                                                                                       February 19, 2025

    Plaintiff Tamara Walker ("Plaintiff") brings this action against her prior employer, Defendant Health Partners Plan, Inc. ("Defendant"), alleging violations of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the Family and Medical Leave Act ("FMLA"), and the Pennsylvania Human Relations Act ("PHRA"). Presently before the Court is Defendant's Motion for Summary Judgment (ECF No. 25), which has been fully briefed. For the reasons that follow, Defendant's Motion (ECF No. 25) will be granted, and judgment will be entered in favor of Defendant on all Counts. An appropriate Order will follow.

**I.      BACKGROUND**[1]

    Defendant is a hospital-owned health maintenance organization that offers health insurance plans and services for Pennsylvania residents who receive Medicaid, health insurance plans under the Pennsylvania Children's Health Insurance Program ("CHIP") for uninsured children who are not eligible for Medicaid, and health insurance plans for Pennsylvania residents on Medicare. ECF No. 30-2 ¶ 1. Plaintiff, who was born on May 27, 1975, worked for Defendant from January 12, 2015 until she resigned on June 5, 2022. ECF No. 1, Compl. ¶ 22; ECF No. 30-2 ¶ 2. Apart from

---

[1]     The facts set forth in this Section are derived from the undisputed evidence of record submitted by the parties and the disputed evidence of record viewed in the light most favorable to Plaintiff. *See* ECF No. 30-2 (Pl.'s Response to Def.'s Statement of Material Facts).

a small number of mandatory overtime hours, throughout her employment, Plaintiff always had the same schedule of Monday through Friday from 8:00 a.m. to 4:30 p.m. ECF No. 30-2 ¶ 21. While originally her position was in person, beginning with COVID in March 2020 and continuing through her resignation in June 2022, Plaintiff worked remotely from her home and never had to come into work. *Id.* ¶ 18.

When Plaintiff first began her employment with Defendant in January 2015, she was a Member Relations Representative in the Members Relations Department. ECF No. 30-2 ¶ 11. In this role, she worked in a call center and handled inbound phone calls from Medicaid members in which she addressed any problems or issues that the Medicaid members had. *Id.* ¶¶ 11–12. In June 2015, Plaintiff was promoted to a Member Relations Representative II and received a pay raise. *Id.* ¶ 14. As a Member Relations Representative II, Plaintiff continued to work in the call center and respond to Medicaid members' inbound calls, and also had the additional responsibility of handling walk-in inquiries from Medicaid or CHIP members. *Id.* ¶ 13.

In January 2019, Plaintiff received a call at work from a member threatening to kill himself, which led to Plaintiff taking a short-term FMLA leave. *Id.* ¶¶ 15, 43. Shortly after returning to work from this leave, Member Relations Manager Alicia Phillips ("Philips") offered Plaintiff a position in the Medicaid outreach group, which Plaintiff accepted. *Id.* ¶ 16. In her Medicaid outreach group position, Plaintiff's pay and benefits remained the same and she continued to report to work at Defendant's call center (just in a different section). *Id.* In Medicaid outreach, Plaintiff called members and addressed matters such as new member orientation, retention, and pharmacy. *Id.*

Between February 2020 and January 2021, Plaintiff and sixteen other employees of the Member Relations Department, who had worked on the Medicaid side, were cross-trained on

Medicare; while eleven employees in the same department who worked on the Medicare side were cross-trained on Medicaid. *Id.* ¶¶ 27–28. Plaintiff, who had only worked in the Medicaid/CHIP side, had asked Cherron Wilmore ("Wilmore")—who became the Member Relations Manager after Phillips left the company at the end of 2020 or beginning of 2021—to be trained on Medicare so that she could learn that line of Defendant's business. *Id.* ¶¶ 14, 17, 25. Plaintiff acknowledged that having a cross-trained group allows for more flexible responsiveness to Defendant's members and allows for more flexibility in managing vacation and personal time off for the group, while also enhancing an employee's value to Defendant and providing greater job security. *Id.* ¶ 26.

For the 2021 Christmas and New Year's Holiday (the "2021 Holiday"), Plaintiff was required to work overtime on December 24 from 10:00 a.m. to 6:30 p.m. and on December 31 from 9:30 a.m. to 6:00 p.m., which Plaintiff did not believe was fair. *Id.* ¶¶ 39, 41. Defendant was required by the federal government to maintain the inbound line on each day of the year for members, including holidays, and at the time of the 2021 Holiday, while the holiday staffing for the Medicaid inbound line could be achieved by volunteers, the team of Member Relations Representatives trained on Medicare inbound was much smaller in number and did not have enough volunteers. *Id.* ¶ 36. Accordingly, the Vice-President over Member Relations directed that all representatives be included on the holiday work rotation. *Id.* There were fourteen Member Relations Representatives, including Plaintiff, who were all qualified to work Medicare inbound and were assigned to work Medicare inbound on December 24, 2021 and on December 31, 2021. *Id.* ¶ 40. With one exception, all of the Member Relations Representatives assigned to work Medicare inbound on December 24, 2021 were also assigned to work on December 31, 2021. *Id.*

Because Plaintiff did not feel it was fair that she was schedule to work both Christmas Eve and New Year's Eve, she spoke by phone with Wilmore's boss, Charles Henries ("Henries"), about

3

the work schedule and asked why she was assigned both days. *Id.* ¶ 41. Plaintiff did not discuss any other concerns or issues she had with her employment during the phone conversation. *Id.* During their call, Henries told Plaintiff he would find out about the holiday rotation, but Henries left his job with Defendant thereafter and never got back to Plaintiff. *Id.* After Henries left his job, Plaintiff sent an email to Human Resources ("HR") representative Janese Brown-Hooker ("Brown-Hooker") asking to speak with her about the 2021 Holiday work schedule. *Id.* ¶ 42. Plaintiff then had a phone conversation with Brown-Hooker in which Plaintiff only discussed how she felt that it was not fair that she had to work on both Christmas Eve and New Year's Eve. *Id.* Brown-Hooker responded that she would get back to Plaintiff after she spoke with Wilmore. *Id.* However, Plaintiff never spoke again with Brown-Hooker, as Brown-Hooker left her employment with Defendant. *Id.* Plaintiff never submitted a written complaint to Brown-Hooker regarding her concerns with the 2021 Holiday work schedule and took no further action with respect to the 2021 Holiday work schedule. *Id.*

In 2022, Plaintiff reported to Madeira Reames ("Reames") as her supervisor, and Reames reported to Wilmore. *Id.* ¶ 14. In addition, there was a "team leader," Maribel Adrams ("Abrams"), who was organizationally in between Plaintiff and Reames, that distributed work and communicated about work when the supervisor was not available. *Id.* By 2022, Plaintiff was being assigned on an as-needed basis to work the Medicare inbound queues in which she answered calls from Medicare members. *Id.* ¶ 30.

In January 2022, Plaintiff told Wilmore over the phone that she did not like doing the Medicare inbound work, to which Wilmore responded, something to the effect of "maybe this is not the job for you anymore" which prompted Plaintiff to hang up. *Id.* ¶ 33. During this phone call, Plaintiff also told Wilmore that she needed refresher training on Medicare and Wilmore responded

4

by directing Plaintiff to contact her team leader, Abrams; however, Plaintiff never asked Abrams for any refresher training. *Id.* ¶ 34. In the last two months of her employment with Defendant in which she actively worked, i.e., between February 4, 2022 and April 4, 2022, Plaintiff began each workday with Medicaid outreach calls and was then assigned to the Medicare inbound queue at some point later in the day. *Id.* ¶ 31.

In January 2022, Plaintiff was in a car accident and went to the emergency room where she was given pain medicine and advised to rest. *Id.* ¶ 44. Plaintiff never had surgery in connection with this car accident nor was any surgery ever scheduled related to this accident. *Id.* However, Plaintiff did go to physical therapy ("PT") following the accident at a location fifteen minutes from her home on certain days after work in February 2022 through April 2022. *Id.* ¶ 45. On February 4, 2022, Plaintiff emailed Reames (her supervisor) requesting to move her lunch and break time to the end of the day so that she could use that time to leave work early for PT on paid time, to which Reames responded that since lunch and break times were to be used during the day and not as a means of leaving early, Plaintiff was to follow policy and use sick or personal time to leave early. *Id.* ¶ 47. Neither Reames nor Wilmore (nor anyone else she worked with) ever did anything to stop or attempt to stop Walker from attending any of her PT appointments on or any time after February 4, 2022. *Id.* ¶ 48.

After the February 4 email, Plaintiff applied for FMLA intermittent leave on February 4, 2022 through Defendant's third-party administrator, New York Life, which decided FMLA claims of Defendant's employees. *Id.* ¶ 49. New York Life approved Plaintiff's FMLA intermittent leave to run from February 4, 2022 through July 3, 2022. *Id.* ¶ 50. Her injuries from the car accident improved and were resolved by the end of her PT in April 2022. *Id.* ¶ 46. No doctor diagnosed

5

Plaintiff with any medical condition connected to the January 2022 car accident that continued to exist after April 2022. *Id.*

Thereafter, on April 4, 2022, in connection with an OB/GYN procedure, Plaintiff applied for FMLA continuous leave again through Defendant's third-party administrator, New York Life. *Id.* ¶ 49. In April 2022, New York Life approved Plaintiff's request for FMLA continuous leave beginning on April 4, 2022. *Id.* ¶ 50. Plaintiff's continuous leave lasted two months. *Id.* ¶ 58. Neither Wilmore nor Reames were aware of any medical condition that Plaintiff had underlying either of Plaintiff's FMLA leaves in 2022. *Id.* ¶ 51.

On Sunday, June 5, 2022, the last day of Plaintiff's two-month continuous leave, Plaintiff sent an email in which she resigned her employment. *Id.* ¶ 58. Within this email, Plaintiff detailed numerous complaints about her time working for Defendant. *Id.* ¶¶ 58–62. Specifically, Plaintiff alleged, *inter alia*, that Wilmore "retaliated" against her for going to Brown-Hooker of HR to address concerns with the 2021 Holiday work schedule, that Wilmore caused Plaintiff's blood pressure medication to increase from stress, that Wilmore permanently put Plaintiff on Medicare and took away her outreach after she applied to FMLA, that other employees have experienced similar mistreatment, and that she expressed her grievances to multiple people in the organization, including HR, but her concerns were ignored. *Id.* ¶¶ 59–62.

However, it is undisputed that throughout her time with Defendant, Plaintiff, who was aware of Defendant's internal complaint/grievance procedure under which any workplace concern could be reported to upper management or HR, never submitted an internal complaint of age discrimination to anyone, never orally complained of or submitted a written complaint of disability discrimination or failure to accommodate a disability to anyone, and never orally complained of or submitted a written complaint of interference with FMLA rights to anyone. *Id.* ¶ 24.

Additionally, it is undisputed that, other than Wilmore, no one discriminated against Plaintiff because of her age, and that no Member Relations manager or supervisor, including Wilmore, ever commented verbally or in writing about Plaintiff's age, about older workers, or about age in general. *Id.* ¶¶ 67–69. Moreover, the only thing that Wilmore allegedly did to Plaintiff because of age was place Plaintiff on the Medicare inbound queue. *Id.* ¶ 70. However, Plaintiff admitted that during her deposition that during the last two months of her active employment, she began each workday with Medicaid outreach calls and was then assigned to Medicare inbound calls at some point later in the day based on Medicare inbound volume, with Defendant's workforce team (i.e., not Wilmore) being the persons who assigned Plaintiff to the Medicare inbound queue at the time of need. *Id.* ¶ 61. Despite having no document or witness to support her contention that this placement on the Medicare inbound queue was because of age, Plaintiff believes that she was placed into the Medicare inbound queue because she was older than Wilmore and the other outreach representatives. *Id.* ¶ 70.

Also undisputed is the fact that Plaintiff never told Wilmore of any medical diagnosis from the January 2022 car accident. *Id.* ¶ 71. Additionally, neither Wilmore nor any Member Relations supervisor ever commented verbally or in writing about Plaintiff's physical or medical condition or about disabled persons. *Id.* ¶ 72. Furthermore, neither Wilmore nor any Member Relations supervisor ever made any negative oral or written comment to Plaintiff about Plaintiff's FMLA leaves or about others on FMLA leave or about FMLA in general. *Id.* ¶ 73.

## II.    **PROCEDURAL HISTORY**

Plaintiff filed this action on March 20, 2023 alleging the following Counts: (Count I) age discrimination in violation of the ADEA; (Count II) age discrimination in violation of the PHRA; (Count III) disability discrimination in violation of the ADA; (Count IV) disability discrimination

7

in violation of the PHRA; (Count V) retaliation in violation of the ADEA; (Count VI) retaliation in violation of the ADA; (Count VII) retaliation in violation of the PHRA; (Count VIII) interference in violation of the FMLA; and (Count IX) discrimination/retaliation in violation of the FMLA. ECF No. 1.

Following discovery, on July 29, 2024, Defendant filed the present Motion for Summary Judgment on each Count alleged in Plaintiff's Complaint. ECF No. 25. Plaintiff filed a Response on September 19, 2024 opposing Defendant's Motion on all Counts except as to Count VIII, Plaintiff's FMLA interference claim, for which Plaintiff does not oppose summary judgement. ECF No. 30-1 at 2 n.2. Thereafter, on October 24, 2024, Defendant filed a Reply in Support of its Motion. ECF No. 35. Accordingly, the Motion is ripe for resolution.

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson v.*

8

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "'[O]nly evidence sufficient to convince a reasonable factfinder' merits consideration at this stage." *Fowler v. AT & T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In considering the Motion, the Court draws all reasonable inferences in the nonmovant's favor. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson*, 477 U.S. at 255.

## IV.    DISCUSSION[2]

### A.    Abandonment of Certain Claims

Plaintiff's Response to Defendant's Motion for Summary Judgment indicates Plaintiff has abandoned certain claims. First, Plaintiff acknowledges in her Response that she does not oppose summary judgment as to Count VIII, Plaintiff's FMLA interference claim. *See* ECF No. 30-1 at 2 n.2. Accordingly, the Court will dismiss with prejudice Count VIII.

Second, although Plaintiff pled her case as a constructive discharge case, her Response does not even mention the term "constructive discharge." As the non-movant, Plaintiff was

---

[2] The claims of violations of the ADEA and the PHRA and the claims of violations of the ADA and the PHRA are discussed jointly as discrimination claims or retaliation claims since Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

obligated to go beyond her pleadings on constructive discharge and by failing to present the claim in her Opposition brief, Plaintiff has abandoned her claim for constructive discharge. *Celotex*, 477 U.S. at 324; *see also Barbounis v. Middle East Forum*, No. 2:19-cv-05030, 2021 WL 5106046, at *1 (E.D. Pa. May 28, 2021) (granting defendant's motion for summary judgment on plaintiff's disparate treatment and/or constructive discharge claims finding plaintiff abandoned her claim for constructive discharge and noting that "the term 'constructive discharge' does not appear anywhere in her opposition brief"); *McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 193–95 (E.D. Pa. 2022) (finding plaintiff abandoned her constructive discharge claim where plaintiff made a single reference to constructive discharge in her summary judgment briefing without any explanation, argument, or citation to the law or the record). Accordingly, this Court finds that Plaintiff has abandoned her claims for constructive discharge and Defendant is entitled to summary judgment on any constructive discharge claim.

### B.     Age Discrimination

Plaintiff's age discrimination claims fail because she has not established a prima facie case of age discrimination. "A prima facie case of age discrimination requires proof that: [i] the plaintiff was at least 40 years old; (ii) [s]he suffered an adverse employment decision; (iii) [s]he is qualified for the position; and (iv) the employer gave more favorable treatment to an employee who is sufficiently younger to permit an inference of age discrimination." *Maresca v. Blue Ridge Commc'ns*, 363 F. App'x 882, 885 (3d Cir. 2010) (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 n.4 (3d Cir. 2006)). Here, Plaintiff is unable to establish a prima facie case because she has not put forth evidence of an adverse employment action nor has she presented any evidence to permit an inference of age discrimination.

In abandoning her constructive discharge claim, Plaintiff now asserts that she suffered an adverse employment action by "being placed back on inbound calls." *See* ECF No. 30-1 at 7. The Supreme Court recently lowered an employee's burden of proof with respect to adverse employment actions in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), holding that "an adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic." *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (explaining *Muldrow*'s impact on Third Circuit precedent). However, *Muldrow* "did not eliminate the injury requirement"—"[a]n employee must still demonstrate an 'injury respecting her employment terms or conditions.'" *Leite v. Sch. Dist. of Philadelphia*, No. 22-cv-306, 2024 WL 3606319, at *7 (E.D. Pa. July 30, 2024) (quoting *Muldrow*, 601 U.S. at 359).

Here, Plaintiff being assigned Medicare inbound calls does not constitute an adverse employment action. Plaintiff did inbound calls when hired by Defendant, and while she was removed from such calls for a few months following a troubling call in 2019, that work adjustment did not become a term or condition of employment. *See Qashu v. Blinken*, No. 22-cv-01077, 2024 WL 3521592, at *5–6 (D.D.C. July 24, 2024) (finding plaintiff's preferred work assignment was not a term or condition or privilege of employment in a post-*Muldrow* analysis); *see also DeLaughter v. Verizon Commc'ns, Inc.*, No. 6:22-CV-2370, 2024 WL 4956730, at *10–12 (M.D. Fla. Dec. 3, 2024) (same). This is evidenced by the fact that Plaintiff was not exclusively assigned to inbound calls; rather, as Plaintiff testified, during the last two months of her active employment, she began each workday doing Medicaid outreach and was then assigned to Medicare inbound queues when the queue became too long. ECF No. 30-2 ¶¶ 31–32. Additionally, Plaintiff admitted that being cross-trained on Medicare inbound calls enhanced her value as an employee and gave

11

her more job security. *Id.* ¶ 26. Thus, while she would have preferred doing exclusively outreach and told Wilmore that fact, exclusive outreach work was not a term or condition of her employment. Accordingly, Plaintiff has not put forth evidence of harms sufficient to establish an adverse employment action for her prima facie case of age discrimination.

Moreover, even if Plaintiff's assignment to inbound calls when the call volume so warranted was a cognizable adverse action, Plaintiff has failed to demonstrate a genuine issue of material fact as to causation. Plaintiff admits that no verbal or written ageist comments were made or directed at her, and there is no direct evidence of age discrimination. Nor is there any evidence from which age discrimination could be inferred. In arguing the contrary, Plaintiff asserts she "presented some evidence that Ms. Collins and Ms. Soto, younger co-workers, were not similarly required to cross-train and be placed back in the queue for incoming calls." ECF No. 30-1 at 7. But Ms. Collins and Ms. Soto, were not similarly situated because they were not cross-trained. And the fact that these individuals were not cross-trained cannot give rise to any inference of age discrimination as Plaintiff herself asked Wilmore to be cross-trained, Plaintiff acknowledged that being cross-trained across different areas in the Department enhances an employee's value and provides greater job security, and sixteen other employees from the Medicaid side were cross-trained on Medicare in the same time period as Plaintiff. ECF No. 30-2 ¶¶ 25–27. No reasonable jury could find that Plaintiff's own voluntarily request to be cross trained and subsequent assignment to such calls, when call volume so warranted, gives rise to an inference of age discrimination.

Accordingly, Plaintiff's age discrimination claims will be dismissed.

C.     **Disability Discrimination & Failure to Accommodate**

Plaintiff has also failed to demonstrate a prima facie case under the ADA. To establish a prima facie case of disability discrimination, the plaintiff must show that "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations . . . and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Gardner v. SEPTA*, 824 F. App'x 100, 105–06 (3d Cir. 2020) (internal quotations and citation omitted). A disability is defined under the ADA as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or when an individual is "regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). "Major life activities" include, among other things, "walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

"A separate cause of action exists under the ADA where an employer fails 'to make reasonable accommodations for a plaintiff's disabilities.'" *MacDougall v. Rhuling*, No. 24-CV-0989, 2024 WL 3993213, at *6 (E.D. Pa. Aug. 28, 2024) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). "A plaintiff bringing an ADA failure-to-accommodate claim must establish: (1) [s]he was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (internal quotations and citations omitted).

Here, Plaintiff failed establish a prima facie claim of disability discrimination or failure to accommodate. First, Plaintiff has failed to raise a genuine issue of fact as to whether she had a disability. Plaintiff admitted in her deposition that she was not disabled as a result of the January 2022 car accident and that she never has been disabled. *See* ECF No. 30-2 ¶ 4. In her Response to

13

Defendant's Motion for Summary Judgment, Plaintiff argues whether an individual considers themselves disabled is not a requirement within the definition of disability; rather it is the practical effects of the condition that matter. *See* ECF No. 30-1 at 10. But even if the Court were to discredit Plaintiff's unequivocal admission, there is no record evidence of an impairment. Plaintiff attaches a two-page exhibit to support: (1) the fact that she went to PT through April 28, 2022, and the injuries she sustained were still causing her issues, and (2) the fact that imaging demonstrated Plaintiff had bulging and herniated discs in her spine and she complained of bilateral leg pain. ECF No. 30-2 ¶¶ 76–77; Ex. D. But neither page is accompanied by any authenticating or explanatory affidavit or any explanation from the doctor who allegedly signed it. Nor does either page indicate that Plaintiff had a substantial limitation on a major life activity. Additionally, it is undisputed that Plaintiff never gave any medical record to any of Defendant's employees and that neither supervisor Reames nor manager Wilmore were aware of any medical condition that Plaintiff had and therefore, there is no support for any "regarded as" theory. ECF No. 30-2 ¶¶ 20–21. Accordingly, Plaintiff has failed to raise a genuine issue of fact as to whether she had a disability and accordingly, her ADA claims fail.

Even if Plaintiff had established a genuine issue of fact as to disability, her claim fails at the accommodation element as well. In her Opposition to Summary Judgment, Plaintiff identified her sole accommodation request as one to leave early for medical appointments, specifically PT, with her preference being to work the same number of hours by switching her lunch hour to the last hour of the day. ECF No. 30-2 ¶ 47. But while Plaintiff may have preferred switching her lunch to the end of each day instead of using sick time or intermittent FMLA, the "ADA does not, however, require an employer to provide a disabled employee with the accommodation of her choosing." *Diaz v. City of Philadelphia*, 565 F. App'x 102, 106 (3d Cir. 2014) (citation omitted).

Rather, the ADA just requires that a plaintiff with a disability be provided a reasonable accommodation. *Yovtcheva v. City of Philadelphia Water Dept.*, 518 F. App'x 116, 122 (3d Cir. 2013). Thus, even if the Court found Plaintiff had a disability, the record is clear that Plaintiff was able to end her remote workday early through the initial use of sick/personal time and through the later use of approved intermittent FMLA leave in order to get to her scheduled PT appointments from February to April 2022. ECF No. 30-2 ¶¶ 45, 47–50. Therefore, Plaintiff was accommodated. Accordingly, Plaintiff's disability claims fail.

### D. Retaliation Claims under the ADEA, ADA, and PHRA

Plaintiff has also failed to demonstrate a prima facie case of retaliation in violation of the ADEA, ADA, and the PHRA. To state a prima facie case of retaliation, a plaintiff must show: (1) she engaged in protected activity, (2) she suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 300 (3d Cir.2007).

First, Plaintiff has not put forth any facts demonstrating that she engaged in protected conduct.[3] An employee engages in protected conduct when they oppose the type of discrimination prohibited by the particular discrimination statute. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). "The Third Circuit has been clear that an employee has not engaged in protected opposition activity when he or she complains about unfair treatment, but stops short of referencing a protected characteristic as the basis for the unfair treatment." *Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home*, No. 13-cv-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014) (citations omitted). This makes sense as "anti-discrimination employment statutes

---

3   It is undisputed that Plaintiff never filed a charge of discrimination with the EEOC or the Pennsylvania Human Relations Commission while employed by Defendant, and therefore, this Court only analyzes the "opposition" part of the anti-retaliation statutes.

are not intended to establish general standards for conduct of employers in dealing with employees." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015) (citations omitted).

Here, Plaintiff asserts in a conclusory fashion that "she engaged in protected activity when she requested accommodation and when she complained of Wilmore's treatment of her." ECF No. 30-1 at 10. Plaintiff provides no factual support for that conclusion. Nevertheless, the record shows that Plaintiff never complained of any discrimination based on a protected characteristic. Rather, prior to her resignation letter, the only thing Plaintiff complained about was the 2021 holiday work rotation that she thought was unfair, which does not amount to protected conduct. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (finding plaintiff's letter to HR complaining about unfair treatment in general and expressing dissatisfaction but not specifically complaining about age discrimination did "not constitute the requisite 'protected conduct' for a prima facie case of retaliation"). Given that Plaintiff has not produced any evidence that she complained of age or disability discrimination, Plaintiff has not demonstrated protected conduct and her retaliation claims under the ADEA, ADA, and PHRA fail.

Additionally, there is no record evidence of a causal link for Plaintiff's retaliation claims. Once again, Plaintiff asserts in a conclusory fashion that "a rational factfinder could conclude the disparate treatment was causally connected to her engagement in protected activity." ECF No. 30-1 at 11. However, this Court was not presented with any evidence to support this conclusion. Accordingly, Plaintiff's retaliation claims under the ADEA, ADA and PHRA fail, and summary judgment will be entered in favor of Defendant.

E. **FMLA Discrimination/Retaliation Claims**

Plaintiff's remaining claims brought under the FMLA also fail. A plaintiff establishes a prima facie FMLA discrimination/retaliation claim by showing (1) she invoked her rights under the FMLA; (2) her employer subjected her to an adverse employment action; and (3) a causal connection exists between the assertion of rights and the employment action. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014). In arguing that she has shown these elements, Plaintiff refers to the conversation she had with Wilmore in January 2022, where Plaintiff indicated that she did not like inbound work and Wilmore told her "maybe this is not the job for you anymore," or something to that effect. ECF No. 30-1 at 12. Plaintiff asserts that after this conversation, "Defendant denied her accommodation request and pushed Plaintiff into additional duties it did not require of other employees for which there is no evidence they ever requested or took FMLA leave, including permanently requiring Plaintiff to work in Medicare and no longer allowing her to work in Outreach." ECF No. 30-1 at 12. However, this conversation was prior to Plaintiff taking FMLA leave in 2022. Moreover, the assertion that Plaintiff was permanently required to work in Medicare and not allowed to do outreach, is contrary to the undisputed evidence. Plaintiff admitted that in the last two months of her employment with Defendant she began each workday with Medicaid outreach and was then assigned to Medicare inbound at sometime later in the day when the volume warranted. ECF No. 30-2 ¶ 31.

But even if there had been some adverse action following Plaintiff's approved FMLA leave, there is no evidence of a causal link between her FMLA leave and an adverse action. Nor is there any evidence to challenge the undisputed evidence that no one attempted to prevent Plaintiff from getting FMLA leave nor that anyone was unhappy with Plaintiff being on FMLA leave.

Accordingly, Plaintiff has failed to put forth a prima facie case of FMLA discrimination/retaliation and therefore, summary judgment will be entered in favor of Defendant on this claim.

## V.      CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. An appropriate Order will follow.

BY THE COURT:

/S/Kai N. Scott
**HON. KAI N. SCOTT**
**United States District Court Judge**
